IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RAYMOND SETZKE                                                    PLAINTIFF

            v.                        Civil No. 07-5185

SHERIFF KEITH FERGUSON;
CAPTAIN HUNTER PETRAY;
OFFICER REYES; OFFICER
FRY; LT. CARTER; DR. HUSKINS;
and JOHN DOE OFFICERS                                            DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds in this case *pro se* and *in forma pauperis*.  Pending before the undersigned for report

and recommendation are cross motions for summary judgment.  Plaintiff filed two motions for

summary judgment (Doc. 37 and Doc. 48).  Defendants responded to the motions (Doc. 41 and

Doc. 51).  Defendants also moved for summary judgment in their favor (Doc. 41).  Plaintiff

responded (Doc. 49 and Doc. 56) to the defendants' motion.

## I.  BACKGROUND

Plaintiff, Raymond Setzke, was arrested in Illinois and transported to Arkansas.

*Response* (Doc. 56) (hereinafter *Resp.*) at ¶ 3.  He was booked into the Benton County Detention

Center (BCDC) on September 21, 2007, on a felony parole violation.  *Id.* at ¶ 1.  The pending

parole violation the sole reason he was incarcerated.  *Id.* at ¶ 2.

On the medical questionnaire Setzke completed when booked in, he noted that he had

problems with his pancreas, was under a doctor's care, had a history of Hepatitis C, a history of

high blood pressure, and problems with his hip, back, and knee.  *Resp.* at ¶ 4.  Although not

-1-

reflected on the questionnaire, Setzke maintains he also stated he was trying to get mental health help through the State of Illinois. *Id.*

On September 22nd Setzke submitted a medical request stating he had "Hep C" for twenty years and was having problems keeping food down due to his pancreas. *Resp.* at ¶ 5. He also said he was having severe back and hip problems. *Id.* On September 23rd Setzke was seen by the doctor and prescribed Zantac and Tylenol. *Id.* at ¶ 6. At the time, Setzke indicates he was unaware of the fact that what he was prescribed was a generic form of Tylenol. *Id.* He maintains Tylenol should not be prescribed to Hepatitis C patients. *Id.* He received the prescribed medication beginning on September 24th. *Id.*

On September 23rd Setzke signed a release permitting jail personnel to obtain copies of his medical records. *Resp.* at ¶ 7. On September 24th Setzke submitted a grievance in which he stated he was in the PC or protective custody cells because he had a medical problem. *Id.* at ¶ 9. He indicated his medical problem did not endanger others. *Id.* He stated he was not in need of protective custody because of his health. *Id.* As a result of being in protective custody, he stated he was locked down twenty-three hours a day. *Id.* He asked to be moved to a normal dorm. *Id.*

The health conditions Setzke was referring to were problems arising from Hepatitis C and high blood pressure. *Resp.* at ¶ 10. Setzke indicates he was told he was in protective custody due to Hepatitis C and no other reason. *Id.* Setzke indicates he was having problems keeping his food down. *Id.* In response to his grievance, Captain Petray stated that they made the housing arrangements in the jail. *Id.*

On September 24th Setzke was assigned to E-102 cell #125. *Resp.* at ¶ 26. He remained assigned to that cell as long as he was at the BCDC. *Id.*

-2-

On September 26th Setzke submitted a second grievance about being segregated because of his health. *Resp.* at ¶ 12. In this one he stated he was segregated because he had Hepatitis C. *Id.* He stated Hepatitis C was no danger to anyone else. *Id.* He maintained there is no medical opinion or facts to show Hepatitis C carriers are a potential danger to anyone. *Id.* He indicated they were using this as an excuse to fill up bed space in protective custody. *Id.* In response, Captain Petray wrote that they made the housing arrangements at the jail. *Id.* at ¶ 13.

Setzke requested a hygiene shave on September 26th and was instructed to ask a pod deputy. *Resp.* at ¶ 14. Setzke asked a deputy and his request was refused. *Id.* Setzke indicates he was not allowed to shave for two months although others were allowed to shave. *Id.*

Setzke indicates he had sensitive skin and he had a rash under his skin. *Resp.* at ¶ 87. Even after the deputies and doctor knew about his sensitive skin, Setzke states he never received anything for the pain and discomfort. *Id.*

On September 29th Setzke submitted a medical request. *Defendants' Exhibit* 3 at page 6. He stated he was in need of a medical shave. *Id.* He indicated his face was broken out under the facial hair and he was in discomfort and pain. *Id.* He also indicated he was still having serious back, hip, and knee pain. *Id.* He stated the Tylenol was not working even though they stopped it that day. *Id.* He indicated the milky liquid they gave him with meals irritated him and caused pain around his diaphragm and pancreas. *Id.* Finally, he said he had a loose and abscessed tooth. *Id. See Resp.* at ¶ 15 (without knowledge to agree or disagree; "I do know my tooth was boken loose after my face was beat into the concrete."). In response Setzke was told they didn't order medical shoes. *Id.* at ¶ 16. He was also told he would see the doctor about his tooth. *Id.*

AO72A
(Rev. 8/82)

On September 29th Setzke filled out a grievance indicating he asked an officer working E-120 about a hygiene shave. *Defts' Ex.* 3 at pages 7-8.  He stated he tried to explain to the officer his face was all broken out underneath his beard and he was in pain. *Id.*  He indicated the officer ordered him to his cell. *Id.*  He asserted the officer's conduct amounted to deliberate indifference to his medical needs. *Id.*  *See Resp.* at ¶ 17 (without knowledge to agree or disagree).  In response, Captain Petray wrote that if Setzke had a medical issue he needed to fill out a medical request. *Id.* at ¶ 18.

On September 30th Setzke wrote that he was from Illinois and had no family in the area. *Resp.* at ¶ 19.  He stated he could not read without glasses and needed approval for his family to mail them to him. *Id.*  He also stated he needed his wallet from his property to send it home. *Id.*  He asked if someone could package the wallet up and mail it C.O.D. or take the contents out and mail it in envelopes. *Id.*  In response, Setzke was told the facility did not send or receive packages in the mail for inmates. *Id.* at ¶ 20.

Setzke was seen by the doctor on October 1st for back pain, hip pain, sensitive skin, and reflux. *Defts' Ex.* 2 at page 5.  Setzke asserts he also complained about coughing up blood and needing a medical shave. *Resp.* at ¶ 21.  He was prescribed Tylenol (Acetaminophen), Benadryl, and Zantac (Ranitidine). *Id.* at ¶ 22.  He received the prescribed medication. *Id.* at ¶ 23.

On October 7th, Setzke requested information regarding warrants and detainers and was informed he had a parole detainer/hold and also had a hold from the Fayetteville Police Department. *Resp.* at ¶ 24.  At approximately 22:50 or 10:50 p.m., Deputy Reyes was assigned to work F-pod and rover. *Defts' Ex.* 4 at page 1.  He was relieving Deputy Freeman for a lunch break in E-pod. *Id.*  The emergency button for cell 125 in E-102 (Setzke's cell) went off. *Id.*

According to Reyes, the following then occurred:

-4-

I pushed the intercom button and asked what the emergency was. Inmate Setzke, Raymond (OCA#39133) yelled out "I need some f------ Ibuprofen because my head is killing me." I told Inmate Setzke that he needed to calm down and that there was no need for him to be cursing at me. I told Inmate Setzke he needed to put in a medical request to see the nurse because she is the one that makes the medical decisions in the facility. I told Inmate Setzke that he needed to stop pushing the emergency button because it was for emergency use only.

Deputy Witcher also told me that Inmate Setzke has been pushing the button repeatedly since approximately 18:30 hours. Approximately three minutes later the emergency button for cell number 125 in E-102 went off. I pushed the intercom button and asked what the emergency was. Inmate Setzke again started to yell and demand to see a nurse. I told Inmate Setzke that I had already discussed this issue with him. I told Inmate Setzke that he needed to put in a medical request and that the nurse would be here tomorrow. Inmate Setzke replied, "That is not going to do me any fucking good right now I need some Ibuprofen right now." I told Inmate Setzke that he needed to stop pushing the emergency button.

Approximately two minutes later . . . the emergency button for cell number 125 in E-102 went off. I pushed the intercom button and asked what the emergency was. Inmate Setzke started yelling "I am going to push this button all f------ night long and start kicking and hitting the door until I get something for my head." I opened up cell number 125 and ordered Inmate Setzke to go to the back of the cell and place his hands on the wall. Inmate Setzke was sitting down on his bunk with both hands covering up his face and did not comply with my order. I again ordered Inmate Setzke to go to the back of the cell and place his hands on the wall. Inmate Setzke stood up in an aggressive stance and balled up both fists. Inmate Setzke took a step towards me. I gained control of Inmate Setzke and placed him on the floor. I gained control of Inmate Setzke's right arm, placed him in an arm bar with a wristlock. Deputy Fry entered the cell and assisted in gaining control of Inmate Setzke's left arm. Inmate Setzke began to resist. I ordered Inmate Setzke to stop resisting but he would not comply.

Inmate Setzke attempted to get up from the floor. I ordered Inmate Setzke to stop resisting and applied minimal pressure to his wrist. Inmate Setzke stopped resisting and I relieved the pressure. I placed handcuffs on Inmate Setzke's wrists and double locked them for safety. Deputy Fry and I assisted Inmate Setzke to his feet and began to escort him out to pod control. Inmate Setzke began to resist again and began to move his shoulders. Inmate Setzke was placed up against the E-102 pod door and ordered to stop resisting. Deputy Witcher opened up the pod door. I ordered Inmate Setzke to get on his knees but he did not comply and

continued to yell.  I again ordered Inmate Setzke to get on his knees but he did not comply.

I delivered one common peronial knee strike to Inmate Setzke's right leg and he complied.  Corporal Thompson, Corporal Becker and Deputies Freeman and Simmons arrived.  I told Corporal Thompson and Corporal Becker of the situation.  Corporal Thompson and Corporal Becker began to question Inmate Setzke.  Corporal Thompson ordered Inmate Setzke to stand up.  Corporal Thompson and Deputy Simmons escorted Inmate Setzke back to his cell.  I returned to my duties with no further incident.

*Defts' Ex.* 4 at pages 1-2.

According to Setzke, he stated he needed to see the nurse but he never cursed Reyes or said anything about Ibuprofen.  *Resp.* at ¶ 28 & ¶ 29.  Setzke questions why he would curse at Reyes when he was requesting help.  *Id.* at ¶ 29.  Setzke points out he was at Reyes' "mercy and logic should prevail when requesting help."  *Id.*

Setzke admits Reyes told him to quit pushing the button.  *Resp.* at ¶ 30.  However, Setzke replied that he needed to see the "nurse now and it was an emergency."  *Id.*  Setzke indicates he did state he would keep pushing the button until a nurse came.  *Id.* at ¶ 36.  He maintains medical emergencies can happen at any time–twenty-four hours a day.  *Id.*  He states his situation was a medical emergency and Reyes did nothing to investigate it as such.  *Id.*  Despite his intentions, Setzke states he only pushed the button a total of three times.  *Id.* at ¶ 37.  Setzke denied that he hit or kicked the door.  *Id.* at ¶ 38.

Setzke was asked to describe his medical problem that resulted in him pushing the emergency button.  He stated:  "I had pain in the back of my neck and side of my face.  I was unable to see strait and was becoming faint, dizzy, and palms sweating.  I began to shake and

AO72A
(Rev. 8/82)

almost falling over.  Onset of bizzare feelings."  *Resp.* at ¶ 35.  *See also* ¶ 85(A)(not feeling normal, could barely see, felt like I was dying).

According to Setzke, "a person as Reyes with a noticably low IQ has only one way to communicate and thats with his fist.  Common sense does not prevail with him.  When deputys are left with medical decisions due to no medical available, one must investigate the issue claimed, not beat them up!!"  *Id.*

Setzke denies having been told by Freeman to stop pushing the emergency button.  *Resp.* at ¶ 31.  Setzke maintains he never talked to Freeman on the intercom.  *Id.*

Setzke indicates he had only pushed the button three times that day in connection with his request for medical attention.  *Resp.* at ¶ 33 & ¶ 34.  However, he indicates because he was locked down twenty-three hours a day the button was used for various things such as requesting legal material, grievance forms, pencils, etc.  *Id.* at ¶¶ 32-34.

When Reyes entered the cell and ordered Setzke to the back of the cell, Setzke states even as sick as he was he got off his bunk and put his hands on the wall.  *Resp.* at ¶ 40.  Setzke maintains he was complying.  *Id.*  Setzke maintains Reyes then "grabbed my hands from the wall as he was behind me and slammed me on the concrete floor tearing the back of my t-shirt.  It was at this point while Reyes had hold of my arm that he had control of me, while twisting my arm, and banging my face into the concrete."  *Id.* at ¶ 41.  Setzke also maintains Reyes placed the handcuffs on him so hard it "cut nerves and stopped circulation."  *Id.* at ¶ 44.  *See also* ¶ 83 ("He did take my arm and slammed me to the concrete from a standing position, contorting my back and arms in positions they are not made to go, when having plaintiff's arm–He had control yet continued to bang my face into the concrete.  When placing the handcuffs on he stomped them

on with his foot then double locked them.  He needlessly drug me by those cuffs to pod door and used my head as a battering ram to open the steal door.").  With respect to Fry, Setzke maintains Fry twisted one arm while Reyes twisted the other.  *Id.* at ¶ 45.  Additionally, he maintains Fry banged his head in pod control.  *Id.* at ¶ 84.

Setzke denies he ever stood up in an aggressive manner and balled up both fists.  *Resp.* at ¶ 42.  He maintains a "sick man does not take a fighting stance.""  *Id.*  He also denies taking a step towards Reyes.  *Id.* at ¶ 43.

Setzke denies he resisted in anyway.  *Resp.* at ¶ 46.  However, he states that an arm can only be twisted so far before it will break.  *Id.*  To prevent his arm from being broke, he indicates he did move his body.  *Id.*

Setzke indicates he was dragged out of the pod by his handcuffs.  *Resp.* at ¶ 50.  He indicates he they picked him up by the handcuffs.  *Id.*  Setzke states his head was used as a battering ram to open the pod door.  *Id.* at ¶ 51.  Setzke maintains he was then thrown to his knees while "keeping handcuffs full force pressure on the wrist and bone cutting circulation, and terrible pain as if my arms we on fire or cut off."  *Id.* at ¶ 52.

When he was being questioned, Setzke maintains he was told to look forward.  *Resp.* at ¶ 55.  Everytime he moved his head, he indicates it was banged into the concrete wall.  *Id.*  Setzke stated he stayed on his knees until they dragged him back to his cell by his handcuffs.  *Id.*  Setzke indicates he was in extreme pain but was not given medical keep.  *Id.* at ¶ 56.

On October 8th Setzke submitted a medical request.  *Resp.* at ¶ 57.  He stated he needed emergency medical help because he had been beaten by officers on October 7th due to needing emergency medical help.  *Id.*  On the 7th he stated he had a severe headache, fever, and the

-8-

shakes. *Id.* He stated he was disorientated. *Id.* As a result of the beating, he said he had cracked ribs, cartilage pain in his elbow, and severe back pain. *Id.* He stated the officers slammed him to the floor and a knee was put in his back. *Id.*

Setzke asserts a lot more damage occurred than was stated in his medical request. *Resp.* at ¶ 57. He adds the following: his tooth; black eye; bruises; no feeling in arm due to nerve damage; cartilage still deformed; severe back pain; and a lump in his neck where Reyes grabbed him and slammed his face into the concrete. *Id.*

On October 10th Setzke submitted a grievance. *Resp.* at ¶ 58. He stated that he asked for emergency medical help on the 7th and instead he got beaten up for needing medical help. *Id.* After the beating, Setzke said he did not get medical help for either his emergency medical issues or for the injuries he suffered as a result of the beating. *Id.* He said he never made a threat or was combative or hostile. *Id.* He stated that Reyes had a bad reputation for beating up inmates. *Id.*

According to Setzke, Reyes had assaulted Cody R. Metcalf on October 14, 2007, and on October 20, 2007. *Resp.* at ¶ 58. Setzke also maintains Reyes assaulted Shane Wilman and Inmate Colten on October 16, 2007. *Id.*

Finally, Setzke asserts Reyes was terminated as a result of the assault on Setzke. *Resp.* at ¶ 58. Setzke was asked to explain what facts he based this assertion on. *Id.* at ¶ 92. He replied: "I know this is why due to me contacting Judge Clinger prior to the incodent, and after the incodent. Judge Clinger I believe is on the County Jail Staff Grievance Committee. Also trustys told me as I was being transported to ADC." *Id.*

-9-

In response to his grievance, Setzke was told that if he had a medical issue he needed to fill out a medical request. *Resp.* at ¶ 59.  He was told the doctor made the medical decisions in the jail.  *Id.*  He was told he refused to obey the orders of the deputy and took an aggressive stance towards the deputy.  *Id.*  He was told he was placed on the floor and handcuffed and yet he still continued to resist.  *Id.*

Setzke was seen by the doctor on October 10th.  *Resp.* at ¶ 60.  The doctor noted Setzke was complaining of headaches, back pain, and elbow problems.  *Id.*  Setzke also maintains he told the doctor he thought he had broken ribs.  *Id.*  Setzke indicates he had bruises all over at this time, had a black eye, and could barely walk.  *Id.*  Setzke maintains the doctor ignored his abnormality with his elbow.  *Id.*  Setzke states he also explained he may have been going through a stroke and had fever and shakes.  *Id.* at ¶ 60 & ¶ 86  He indicates the doctor ignored this.  *Id.* The doctor prescribed Flexeril (Cyclobenzaprine) for five days. *Id.* at ¶ 60.  Setzke received the prescribed medication.  *Id.* at ¶ 61.

On October 12th Setzke requested that a certificate regarding his inmate account be completed for his *in forma pauperis* application.  *Resp.* at ¶ 62.  The certificate was completed. *Id.*

On October 20th Setzke asked if he had any new warrants anywhere.  *Resp.* at ¶ 63.  He also asked if they had the warrant numbers for the warrants he did have.  *Id.*  In response he was told he was there on a parole hold.  *Id.*  He was also told there was a hold out of the Fayetteville Police Department.  *Id.*

On October 26th, Setzke asked to use the Arkansas Code Annotated or go to the law library. *Resp.* at ¶ 64.  He also asked for the address to Hanna House in Rogers.  *Id.*  In response

AO72A
(Rev. 8/82)

he was told to contact his attorney.  *Id.*  Setzke, however, maintains he did not have an attorney. *Id.*

On November 7th his administrative segregation status was reviewed.  *Defts' Ex.* 4 at page 3.  It was noted Setzke was in segregation due to Hepatitis C and D 149 overflow.  *Id.* Setzke, however, notes he had been in protective custody due to a medical issue since September 24, 2007, and was never in D-149.  *Resp.* at ¶ 65.

On November 30th Setzke stated his wife called there earlier in the week and asked why he was still there.  *Resp.* at ¶ 66.  He indicated she was told he was on a parole hold.  *Id.*  Setzke stated that on September 24th he signed a waiver to be sent back to the Arkansas Department of Correction (ADC).  *Id.*  He asked why the computer still showed him on a parole hold.  *Id.*  He asked if the way it was in the computer would keep him from getting transported.  *Id.*  In response he was told a parole hold was the same as a hold for the Department of Correction and that he would go when the prison called for him.  *Resp.* at ¶ 67.

On December 4th Setzke complained that he hadn't been transported to the ADC yet. *Resp.* at ¶ 68.  He stated that only one inmate out of E-102 was transported each time.  *Id.*  He stated his parole waiver said upon signing he would be transported.  *Id.*  He believed they were manipulating who got transported and keeping him from getting transported.  *Id.*

In response Setzke was told the ADC specified who they want.  *Resp.* at ¶ 69.  He was told the ADC classified inmates and decided when the inmates were to be transported.  *Id.*  On December 21st Setzke was released to the ADC.  *Id.* at ¶ 70.

While at the BCDC, Setzke maintains some of his legal mail sent to the district court was "intercepted" and the "district court has no record of the correspondence."  *Resp.* at ¶ 71.  When

-11-

he received mail from the court, he indicates many times it was open and "had been viewed." *Id.* With respect to Fry, Setzke contends anytime he received mail from the court Fry "would scan to read it, and he knew what the documents contained." *Id.* at ¶ 78. Setzke maintains Fry was worried about the suit with him and Reyes. *Id.* Setzke believes they read his legal mail to "come up with excuses to cover for what [he] stated in letters to the Judge an[d] in complaints and amended complaints." *Id.* According to Setzke, Fry and Reyes knew he wrote everything down and told everything to the courts. *Id.*

Setzke did not have an attorney representing him on the parole revocation charge. *Resp.* at ¶ 72. Setzke did not have access to the law library or any legal materials. *Id.* at ¶ 75. Setzke missed no deadlines for filing any documents with the court. *Id.* at ¶ 74.

He was able to send and receive personal mail. *Resp.* at ¶ 73. He had access to basic writing materials such as pens or pencils and paper. *Id.* at ¶ 76. Setzke indicates he was only given two pieces of paper a week and two envelopes. *Id.* He states he had to write pleadings on paper sent from the court and borrow envelopes from others. *Id.* at ¶ 75.

Setzke was seen by Dr. Huskins on three occasions. *Resp.* at ¶ 79. Setzke was asked to explain how Dr. Huskins exhibited deliberate indifference to his serious medical needs. *Id.* Setzke replied:

> At the time of booking–the plaintiff alerted deput[ies] that the plaintiff was being evaluated for mental health by S.S. in Springfield, IL., at this point Dr. Huskins who is a head of medical failed to accomodate the plaintiff with a mental health evaluation, and allowed the sheriff and staff to segregate, and isolate the plaintiff before and after the incident doing extreme mental health damage to plaintiff and causing sensory deprivation. This was a deliberate indifference. By have 24 hr. emergency medical and not leaving a nursing staff to accomodate emergency medical to plaintiff is a deliberate indifference when plaintiff had needs. There was no medical staff due to the jail saving money and it was bothersome to

-12-

> Deputy Reyes to take the plaintiff to the emergency room.  Dr. Huskins gave
> Tylenol to a Hep C patiant.  For all the above a deliberate indifference to a
> serious medical need.

*Resp.* at ¶ 79.

Setzke agrees that all decisions regarding medical care at the BCDC are made by the jail medical staff. *Resp.* at ¶ 80.  However, he points out that the sheriff does not have medical staff at the facility twenty-four hours a day.  *Id.*  Therefore, when medical staff are not present, deputies make the determination if the situation presented constitutes an emergency that necessitates the inmate being taken to an emergency room.  *Id.*  Setzke maintains the deputies are not qualified to make this decision.  *Id.*  He asserts the deputies may fail to respond to an inmate requesting emergency medical care, not recognize an emergency situation, or discriminate against inmate with certain charges against him.  *Id.* at ¶ 85(A).  While the BCDC policy looks good on paper, he maintains it is not effective.  *Id.* at ¶ 80.  He maintains certified medical staff must be required to be present twenty-four hours a day or a deputy must call 911 for medical situations if medical staff are not present.  *Id.* at ¶ 85(B).  Setzke also points out that while a written medical request is necessary for non-emergency medical care, the BCDC medical care policy states that emergency medical care is available twenty-four hours a day.  *Id.* at ¶ 81.

Apart from the injuries he suffered as a result of the alleged used of physical force by the deputies on October 7th, Setzke was asked if he suffered any injury as a result of not receiving medical care on October 7th.  He responded that he did.  *Resp.* at ¶ 82.  He stated he didn't know if he suffered a stroke, etc., since he had not had an EKG to evaluate.  *Id.*  However, he indicates he was purposely kept isolated by the sheriff and his staff until he was completely healed.  *Id.*  He also maintains he needs a mental health evaluation due to the isolation.  *Id.*

-13-

Setzke was asked to explain how Lt. Carter failed to protect him from attack by Reyes or Fry. Setzke responded: "Reyes has a continued course of conduct since employed at the jail and Lt. Carter knew this. Lt. Carter also knows the conduct of all jail staff and the reputation of the Benton Ct. Jail and he fails to correct this deficientcies." *Resp.* at ¶ 88.

Setzke also complained Lt. Carter, after this case was filled, classified him as a sex offender based on a twenty-nine year old conviction in the State of Illinois for indecent liberties with a minor. *Resp.* at ¶ 89. Setzke indicates he was not a registered sex offender in Illinois but is a registered sex offender in Arkansas. *Id.* at ¶ 94.[1]

Setzke states he was initially classified as a parole violator. *Resp.* at ¶ 89. After his classification changed, Setzke indicated he was isolated and other inmates were told that he was a sex offender. *Id.* Until this case was filed, Setzke states he had cell mates. *Id.*

Setzke admits his housing assignment was based on his having Hepatitis C and not on his classification as a sexual offender or ex-sex offender. *Resp.* at ¶ 90. His housing assignment never changed. *Id.* at ¶ 26. However, after he filed this case on October 29, 2007, Setzke maintains he was isolated. *Id.* at ¶ 90.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[1]In a separate lawsuit, *Setzke v. Norris, et al.,* Civil No. 07-5186, Setzke maintains his constitutional rights were violated when he was required to register in December of 2004 as a sex offender under the Arkansas Sex Offender Registration Act of 1997, Ark. Code Ann. §§ 12-12-901 *et seq.,* based on his 1981 conviction in Illinois for indecent liberties with a child.

judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III.  DISCUSSION

As noted above, there are cross-motions for summary judgment before the court. Plaintiff has asserted the following claims:  (1) denial of access to the courts; (2) denial of medical attention; (3) excessive force claims against Reyes and Fry; (4) failure to intervene in the excessive use of force against all defendants except Reyes and Fry; (5) failure to train or supervise; (6) interference with his legal mail by Fry; and (7) improper classification and/or housing assignment based on his health condition or past conviction.

#### *Access to Courts*

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing*, *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996);  *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494-95, 52 L. Ed. 2d 72 (1977)).  In *Myers,* the Eighth Circuit stated that:

-15-

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail. Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts. To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims. Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

*Myers*, 101 F.3d at 544 (citations omitted).

In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the Supreme Court in *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) and *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), "determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'" *Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55).

In this case, Setzke's claim fails because he has suffered no actual injury. Although he states he had no access to a law library or legal materials and did not have an attorney on the parole revocation charge, Setzke missed no deadlines for filing any documents with any court and indicates he kept the courts informed of everything that was occurring . *Resp.* at ¶¶ 74 & 78. *See Klinger v. Department of Corrections*, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to

-16-

AO72A
(Rev. 8/82)

library is complete and systematic).   Although "[p]ro se defendants have a right of access to adequate law libraries or adequate assistance from persons trained in the law," *United States v. Knox*, 950 F.2d 516, 519 (8th Cir. 1991)(quotations omitted), the right is not an abstract one and the inmate must "demonstrate that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351.  This claim fails as a matter of law.

### Denial of Medical Care

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007).  In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094,

-17-

1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 498 (8th Cir. 2008).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

In this case, Setzke maintains Dr. Huskins exhibited deliberate indifference when he: failed to accommodate Setzke's request for a mental health evaluation, *Resp.* at ¶ 79 & (Doc. 49) at page 6; when he prescribed Tylenol to a Hepatitis C patient which could have damaged Setzke's liver, *Resp.* at ¶ 79 & (Doc. 49) at page 6; when he failed to keep medical staff on duty twenty-four hours a day, *Resp.* at ¶ 79 & (Doc. 49) at page 6; and when he allowed the sheriff's staff to segregate inmates with Hepatitis C pursuant to the policy that allows the segregation of inmates with communicable diseases although in Setzke's opinion Hepatitis C is not a communicable disease, *Resp.* at ¶ 79 & (Doc. 49) at page 7.

Clearly, the "duty to provide medical care encompasses detainees' psychiatric needs." *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002)(citations omitted). *See*

AO72A
(Rev. 8/82)

*also Vaughan v. Lacey,* 49 F.3d 1344, 1346 (8th Cir.1995)("Prison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious mental-health-care needs."). A psychiatric or mental condition can constitute a serious medical need and pose a risk of serious harm. *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir. 2000).  However, in this case, Setzke merely indicates that when he was booked in he alerted the deputies that he was being evaluated for "mental health" by the Social Security Administration. *Resp.* at ¶ 79; (Doc. 79) at page 6. His medical questionnaire does not indicate any mental health problems. *Defts' Ex.* 2 at page 1. He submitted no medical requests asking for a mental health evaluation or treatment for a mental health issue. *See Defts' Ex.* 2.

With respect to Dr. Huskins' act of prescribing Tylenol to Setzke, even if we assume for the sake of this motion that Setzke should not have been prescribed this medication because he had Hepatitis C, this shows at most an error in judgment on Dr. Huskins' part.  "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)(citation omitted).  The type of medication to prescribe, the tests to be ordered, and the appropriate treatment for a given medical condition all involve the exercise of medical judgment. Setzke's mere disagreement with Dr. Huskins' decision is not the basis for § 1983 liability. *See e.g., Meiur v. Greene County Jail Employees*, 487 F.3d 1115, 118-19 (8th Cir. 2007).  *See also Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1992)("[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation.").  Medical malpractice alone . . . is not actionable under the Eighth Amendment." *Popoalii v. Correctional Medical Services*, 512 F.3d

-19-

488, 499 (8th Cir. 2008). "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence. . . . Deliberable indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id.* (citations and internal quotation marks omitted).

With respect to alleged failure of Dr. Huskins and/or Sheriff Ferguson to have medical staff on duty twenty-four hours a day, there is no constitutional requirement that a detention facility have medical staff on duty twenty-four hours a day. *See e.g., Free v. Granger*, 887 F.2d 1552, 1556 (11th Cir. 1989)("Proof of staffing or procedural deficiencies may give rise to a finding of deliberate indifference.  It is not sufficient, however, to point to the absence of a medical doctor, or of a round-the-clock nurse, and decry the staffing policy as unconstitutional."). Rather, the question is whether the defendants have violated the Eighth Amendment by exhibiting deliberate indifference to Setzke's serious medical needs. *Cf. Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir. 1988)(understaffing can support a finding of deliberate indifference), *vacated,* 109 S. Ct. 2425 (1989), *decision reinstated*, 886 F.2d 235 (9th Cir. 1989).  The BCDC plan requires implementation of the emergency medical care plan in the event of medical emergencies.  (Doc. 49) at page 22.  The plan indicates emergencies include but are not limited to:  severe bleeding; unconsciousness; serious breathing difficulties; head injury; severe burns; severe pain; sudden onset of bizarre behavior; and health or life threatening situations.  *Id.* A deputy confronted with a medical emergency is directed to request assistance from Bentonville Emergency Medical Services (EMS).  *Id.*

Setzke has not shown that Dr. Huskins or Sheriff Ferguson were directly involved in the decision not to provide him with emergency medical care on October 7th.  Rather, the decision

-20-

that Setzke was not in need of emergency medical attention was apparently made by Reyes. Setzke maintains Reyes was not qualified to make the decision whether his condition constituted a medical emergency and should have contacted medical personnel.  Setzke has produced nothing to suggest the delay in his receipt of medical care on October 7th had a detrimental impact on his health. "[A]n inmate who claims that delay in medical treatment rose to the level of a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment."  *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995).  *See also Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(when inmate alleges that delay in treatment rise to level of Eighth Amendment violation, objective seriousness of deprivation should be measured by effect of delay, and to establish this effect inmate must place verifying medical evidence in record).  He has submitted no medical evidence establishing the detrimental effect of the delay.  His claim involving the alleged delay in treatment following his October 7th request for treatment therefore fails as a matter of law.

With respect to his claim that defendants' exhibited deliberate indifference when he was placed in protective custody because he has Hepatitis C, we note that Hepatitis C is a "viral disease that can be transmitted parenterally, such as through a blood transfusion, sharing of needles among drug users, or 'other intimate personal contact with an infected person.'" *Rodriguez v. Johnson*, 2008 WL 2403722, *1 n.2 (S.D. Tex. June 10, 2008)(*quoting* Dorland's Illustrated Medical Dictionary 856 (31st ed. 2007)).  *See also Powell v. City of Pittsfield*, 221 F. Supp. 2d 119, 147 (D. Mass. 2002)(Hepatitis C may be transmitted through the exchange of bodily fluids).  The virus "remains in the blood for years and accounts for a large percentage of cirrhosis, liver failure, and liver cancer cases." *Downs v. Hawkeye Health Services, Inc.*, 148

-21-

F.3d 948, 949 n. 2 (8th Cir. 1998)(citation omitted).  Given the fact that Setzke had Hepatitis C, placing him in protective custody for health reasons did not exhibit deliberate indifference on the defendants' part.  *See Anderson v. Romero*, 72 F.3d 518 (7th Cir. 1995)(it is permissible, not mandatory, for prisons to segregate inmates who had tested positive for HIV); *Welch v. Sheriff, Lubbock County, Tex.*, 734 F. Supp. 765, 768 (N.D. Tex. 1990)(Exposing inmates to communicable disease may violate their constitutional rights).

### Excessive Force Claims Against Reyes and Fry

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).  In this case, Setzke was a pretrial detainee when the alleged incident of excessive force occurred.  In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees].
> *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447
> (1979).  Their confinement conditions are analyzed under the due process clause
> of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's
> "cruel and unusual punishment" standard which is used for convicted prisoners.
> *Id*.  The injuries detainees suffer must be necessarily incident to administrative
> interests in safety, security and efficiency.   As a pretrial detainee, Freeman's
> excessive-force claim is properly analyzed under the due process clause of the
> Fourteenth Amendment.  *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10
> (1989) (due process clause protects pretrial detainee from force amounting to
> punishment).

-22-

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, we are presented with contradictory versions of what occurred when Reyes and Fry entered Setzke's cell on October 7th. According to Reyes, Setzke refused to comply with orders, took an aggressive stance, and resisted the officers' efforts to maintain control of him. Reyes maintains it was Setzke's continued acts of resistance that resulted in his application of one common peroneal knee strike to Setzke's right leg.

Setzke maintains he got off his bunk and put his hands on the wall after Reyes' first request. Despite his compliance, Setzke states Reyes grabbed him from behind and slammed him to the concrete floor, twisting his arm, and banging his face into the concrete. Setzke indicates Reyes put the handcuffs on him so tight that it cut off the circulation in his arms. Setzke states he was then dragged out of his cell and the pod by the handcuffs and his head was used as a battering ram to open the door. Setzke maintains Fry twisted his one arm while Reyes

-23-

twisted the other arm.  Setzke also contends Fry banged his head in pod control.  Setzke's version of the events is partially supported by sworn statement submitted by Jeremy Pennington, Setzke's former cell-mate.

At the summary judgment stage, we are not free to believe one parties' version of the events and disbelieve the other parties'.  Clearly, there are genuine issues of material fact as to whether excessive force was used against Setzke on October 7th.

### Failure to Intervene

It has been held that even if an officer did not participate in the use of unnecessary or excessive force, "he was nonetheless under a duty to prevent the use of such force, even if the officers beating [the detainee] were his superiors" if the constitutional violation took place in his presence.  *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir. 1983);  *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981).  The officer accused of failing to take reasonable steps to protect the victim must have had a realistic opportunity to prevent the attack.  *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-1331 (11th Cir. 2008)(citations omitted).  *See also Putman*, 639 F.2d at 424 (liability if the non-intervening officer saw the beating or had time to reach the offending officer).

In this case, Setzke  does not maintain Sheriff Ferguson, Captain Petray, or Lt. Carter were present at the scene of the use of excessive force and did nothing to stop Reyes or Fry. *Resp.* at ¶ 95.  Instead, he maintains they failed to adopt and enforce policies and failed to train and supervise.  This is an entirely separate theory of liability than a failure to intervene claim.

-24-

### Failure to Train or Supervise

A supervisor may be held individually liable under § 1983 if he fails to train or supervise the subordinate who caused the violation. *Brockinton v. City of Sherwood, Ark.* 503 F.3d 667, 673 (8th Cir. 2007). "The standard of liability for failure to train is deliberate indifference. The standard of liability for failure to supervise is 'demonstrated deliberate indifference or tacit authorization of the offensive acts.'" *Id.* "The deliberate-indifference standard is a subjective one: [T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007)(internal quotation marks and citation omitted).

Setzke contends Lt. Carter was aware of Reyes' conduct and his reputation and failed to take any corrective action. *Resp.* at ¶ 88. With respect to Sheriff Ferguson and Captain Petray, Setzke maintains they were aware that the deputies were adopting their own policies and the conduct used and turned a blind eye. *Resp.* at ¶ 91.

However, the evidence presented on the summary judgment record is insufficient to show a genuine issue of material fact as to whether the supervisory officials exhibited deliberate indifference or tacit authorization for the offensive acts. With respect to Reyes, the bad reputation referred to by Setzke is an alleged series of "attacks" on inmates. *See Resp.* at ¶ 58. Each of the attacks identified by Setzke occurred **after** the attack on Setzke (attack on Metcalf October 14, 2007, attack on Wilman and Colton October 16, 2007, and attack Metcalf on October 20, 2007). *Id.* Thus, the attacks could not have prompted action on the part of the officials prior to Setzke's alleged attack. Setzke points to no history of detention center officials

-25-

unreasonably using force such that the need for additional training or supervision was plain.  He

does not contend the BCDC's policy with regard to the use of force is inadequate.  He does not

explain, or describe, the alleged "use of force" policy that was adopted by the deputies.  This

conclusory allegation is insufficient to show the existence of a genuine issue of material fact.

### Interference with Mail

"Inmates have a First Amendment right of free speech to send and receive mail. *Hudson*

*v. Palmer*, 468 U.S. 517, 547, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984).  "The fact of

confinement and the needs of the penal institution impose limitations on constitutional rights,

including those derived from the First Amendment." *Jones v. North Carolina Prisoners' Union*,

433 U.S. 119, 125, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977).

"Prisoners' First Amendment rights encompass the right to be free from certain

interference with mail correspondence."  *Davis v. Norris*, 249 F.3d 800, 801 (8th Cir. 2001).

"Interference with legal mail implicates a prison inmate's right to access to the courts and free

speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis*

*v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).   "A prison policy that obstructs privileged inmate

mail can violate inmates' right of access to the courts." *Weiler v. Purkett*, 137 F.3d 1047, 1051

(8th Cir. 1998).

Restrictions on this First Amendment right are valid "only if [they are (1)] reasonably

related to legitimate penological interests,"such as security, order, or rehabilitation and are (2)

no greater than necessary to the protection of the governmental interest involved.  *Turner v.*

*Safely*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987).  In balancing the competing

-26-

interests, courts afford greater protection to legal mail than non-legal mail and greater protection to outgoing mail than to incoming mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S. Ct. 1874, 1881-82, 104 L. Ed. 2d 459 (1989).

Here, Setzke was allowed to send and receive personal and legal mail while he was at the BCDC. *Resp.* at ¶ 71 & ¶ 73. However, he believes some mail he sent to the court was intercepted. *Id.* at ¶ 71. He bases this belief on the fact that the court has no record of receiving the correspondence from him. *Id.* Additionally, when he received mail from the court "many times it was already open an[] had been viewed." *Id.* He maintains that anytime he received mail from the court Fry would "scan to read it" and he knew what the documents contained. *Id.* at ¶ 78. According to Setzke, Fry was worried about the case against him and Reyes so they read his legal mail to come up with excuses to cover for what he stated in letters to the judge and documents he sent to the court. *Id.*

This claim fails because Setzke has not shown that his legal position was prejudiced by the alleged interference with his legal mail. *See e.g., Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997)(claim fails without evidence of improper motive or resulting interference with inmate's right to counsel or access to courts). *See also Walker v. Navarro County Jail*, 4 F.3d 410, 413 (5th Cir. 1993)(an inmate shows actual injury by establishing his position as a litigant was prejudiced due to the disputed acts). Defendants are therefore entitled to summary judgment on this claim.

AO72A
(Rev. 8/82)

***Housing Assignment***

In this case, Setzke contends both his assignment to protective custody because of his Hepatitis C and later because of his designation as a sex offender violated his federal constitutional rights. "We begin with the fundamental principle that a person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged." *Rapier v. Harris*, 172 F.3d 999, 1002 (7th Cir. 1999). *See also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Pretrial detainees are presumed innocent and may not be punished."). Under *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), "restrictions on pretrial detainees that implicate a liberty interest protected under the Due Process Clause may not 'amount to punishment of the detainee.'" *Benjamin v. Fraser*, 264 F.3d 175, 188 (2nd Cir. 2001). "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

"Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Bell*, 441 U.S. at 537. In determining whether a particular restriction constitutes a permissible restriction or amounts to impermissible punishment, the court first asks "whether the restriction is based upon an express intent to inflict punishment." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). If "there is no indication of such an express intent," the court next considers "whether punitive intent can be inferred from the nature of the restriction." *Valdez*, 302 F.3d at 1045.

-28-

In this regard, the Supreme Court in *Bell* held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. "An action may be reasonably related to a legitimate governmental purpose if an alternative purpose to which the act may rationally be connected is assignable for it and the action does not appear excessive in relation to the alternative purpose assigned." *Robles v. Prince George's County, Maryland*, 302 F.3d 262, 269 (4th Cir. 2002)(internal citations and punctuation omitted).

> A reasonable relationship between the governmental interest and the challenged restriction does not require an "exact fit," nor does it require showing a "least restrictive alternative." Otherwise, every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Moreover, it does not matter whether we agree with the defendants or whether the policy in fact advances the jail's legitimate interests. The only question that we must answer is whether the defendants' judgment was rational, that is, whether the defendants might reasonably have thought that the policy would advance its interests.

*Valdez*, 302 F.3d at 1046.

In this case, Setzke was placed in protective custody because of his Hepatitis C. *Resp.* at ¶ 9, ¶ 10, ¶ 12, ¶ 27. He was assigned to E-102, cell #125 and remained in the same cell throughout his incarceration at the BCDC. *Id.* at ¶ 26. Setzke's booking report indicated under security class that he was a sex offender. *Defts' Ex.* 1 at page 4. Although he maintains he was illegally required to register, Setzke is a registered sex offender in Arkansas. *Resp.* at ¶ 94.

Until he filed this case, Setzke maintains his housing assignment was based on his medical classification. *Resp.* at ¶ 90. Once he filed the case, Setzke maintains Lt. Carter

-29-

classified him as a sex offender and isolated him.  *Id.*  Until he filed this case, Setzke states he had cellmates.  *Id.* at ¶ 89.

There were clearly legitimate non-punitive reasons for placing individuals with serious health problems and sex offenders in a separate housing unit from other inmates.  *See e.g., Brown-El v. Delo*, 969 F.2d 644, 647 (8th Cir. 1992)(detention center has a legitimate interest in segregating individual inmates from general population for non-punitive reasons, such as where there is a threat to the safety and security of the institution).  Setzke has presented no evidence of punitive intent on the part of the defendants.  Detention center officials have discretion in classifying prisoners and determining where they should be housed within the facility.  *See Hewitt v. Helms*, 459 U.S. 460, 468, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983).  The decision to place Setzke in the protective custody pod was not a disciplinary matter, or punishment for the crimes he was being charged with, rather it was an administrative strategy designed to preserve order in the prison and protect the safety of all inmates.

## IV.  CONCLUSION

I therefore recommend as follows:  (1) plaintiff's motions for summary judgment (Doc. 37 and Doc. 48) be denied; and (2) defendants' motion for summary judgment (Doc. 41) be granted in part and denied in part.  Specifically, I recommend that defendants' motion (Doc. 41) be granted on the denial of access to courts claim, the denial of medical care claim, the failure to intervene claim, the failure to train or supervise claim, the interference with legal mail claim, and the improper classification and/or housing assignment claim.  This would dismiss all claims against Sheriff Keith Ferguson, Captain Hunter Petray, the Unknown Lt., or John Doe Officers,

-30-

Lt. Carter, and Dr. Haskins or Dr. Huskins.  This would leave for later resolution the excessive force claims against Officer Reyes and Officer Fry.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of November 2008.


/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-31-